UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT FRANKFORT
*Electronically filed*

| | |
|---|---|
| **DANVILLE CHRISTIAN ACADEMY, INC**. | |
| and | |
| **COMMONWEALTH OF KENTUCKY**, *ex rel.* Attorney General Daniel Cameron | |
| *Plaintiffs* | |
| v. | Civil Action No. _____ |
| **ANDREW BESHEAR**, in his official capacity as the Governor of the Commonwealth of Kentucky, | |
| *Defendant* | |

## VERIFIED COMPLAINT

*"[E]ducating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school."*

*- Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049, 2064 (2020)

Religious education and religious worship go hand-in-glove. Indeed, "[r]eligious education is vital to many faiths practiced in the United States." *Id.* For example, "[i]n the Catholic tradition, religious education is 'intimately bound up with the whole of the Church's life.'" *Id.* at 2065 (quoting Catechism of the Catholic Church 8 (2d ed. 2016)). And, "Protestant churches, from the earliest settlements in this

country, viewed education as a religious obligation." *Id.* "The contemporary American Jewish community continues to place the education of children in its faith and rites at the center of its communal efforts." *Id.* In Islam, the importance of education "is traced to the Prophet Muhammad, who proclaimed that '[t]he pursuit of knowledge is incumbent on every Muslim.'" *Id.* "The Church of Jesus Christ of Latter-day Saints has a long tradition of religious education," and Seventh-day Adventists "trace the importance of education back to the Garden of Eden." *Id.* at 2066. In short, religious education is so central to religious exercise that to burden the former is to burden the latter.

The absence of government-imposed burdens on religious exercise is one of the foundations of the American Republic. "Since the founding of this nation, religious groups have been able to 'sit in safety under [their] own vine and figtree, [with] none to make [them] afraid.'" *Tree of Life Christian Schools v. City of Upper Arlington*, 905 F.3d 357, 376 (6th Cir. 2018) (Thapar, J., dissenting) (quoting Letter from George Washington to Hebrew Congregation in Newport, R.I. (Aug. 18, 1790)). This is the promise of America. It is one of the Nation's "most audacious guarantees." *On Fire Christian Ctr., Inc. v. Fischer*, 453 F. Supp. 3d 901, 906 (W.D. Ky. 2020).

But this audacious guarantee has been threatened repeatedly this year by Governor Andrew Beshear. Just before Easter, he purported to outlaw religious services in the Commonwealth by executive order, and then he sent Kentucky State Police troopers to record the license plate numbers of churchgoers. The Sixth Circuit halted his discriminatory actions not once, but *twice. See generally Roberts v. Neace*,

958 F.3d 409 (6th. Cir. 2020) (per curiam); *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020) (per curiam). This Court did as well. *See generally Tabernacle Baptist Church, Inc. v. Beshear*, 459 F. Supp. 3d 847 (E.D. Ky. 2020).

On Wednesday, November 18, 2020, Governor Beshear issued Executive Order ("EO") 2020-969, which prohibits all public and private schools from meeting in-person for the next several weeks.[1] The order contains no accommodations for religious education, despite such education being recognized by the Supreme Court as a "vital" part of many faiths. *See Our Lady of Guadalupe*, 140 S. Ct. at 2064. And, like the Governor's previously enjoined orders, the latest order burdens religious institutions while arbitrarily allowing other gatherings that pose similar health risks to continue.

Regardless of how well-intentioned the Governor might be, his actions violate the federal and state constitutions and Kentucky's Religious Freedom Restoration Act. His actions also infringe on the autonomy of religious institutions and violate the Constitution's Establishment Clause.

---

[1]   The next day, the Director of the Centers for Disease control announced, "We should be making data driven decisions when we are talking about what we should be doing for institutions or what we should be doing for commercial closures. For example, as we mentioned, last spring CDC did not recommend school closures nor did we recommend their closures today. . . . K through 12 schools can operate with face to face learning and they can do it safely and they can do it responsibly." *See* "CDC Director Redfield Says It Does Not Recommend Closing Schools, Covid Acquired 'In The Household'" (Nov. 19, 2020) available at https://www.youtube.com/watch?v=sxKhJaqEkcY (last visited Nov. 20, 2020). He further stated "[t]he truth is, for kids K-12, one of the safest places they can be, from our perspective, is to remain in school," and that it is   "counterproductive . . . from a public health point of view, just in containing the epidemic, if there was an emotional response, to say, 'Let's close the schools.'" Ryan Saavedra, *CDC Director: Schools Among 'Safest Places' Kids Can Be, Closing Schools An 'Emotional Response' Not Backed By Data*, The Daily Wire, November 19, 2020, https://www.dailywire.com/news/cdc-director-schools-among-safest-places-kids-can-be-closing-schools-an-emotional-response-not-backed-by-data.

Among the schools impacted by the Governor's actions is Danville Christian Academy ("Danville Christian"), which practices its faith in Boyle County, Kentucky. Danville Christian's founders created the school to mold Christ-like scholars, leaders, and servants who will advance the Kingdom of God. To that end, Danville Christian provides students with a Christ-centered environment along with academic excellence so they may grow spiritually, academically, and socially. And Danville Christian accomplishes this religious calling by educating students with a Christian worldview in a communal in-person environment.

For these reasons, the Plaintiffs bring this suit against the Governor, and for their Complaint for declaratory and injunctive relief state as follows:

## PARTIES

1. Daniel Cameron is the duly elected Attorney General of the Commonwealth of Kentucky. As such, he is the lawyer for the people of Kentucky. Ky. Rev. Stat. ("KRS") 15.020; *Commonwealth ex rel. Beshear v. Commonwealth ex rel. Bevin*, 498 S.W.3d 355, 362 (Ky. 2016).

2. Attorney General Cameron brings this suit on behalf of the Commonwealth of Kentucky. As the chief law officer of the Commonwealth, Attorney General Cameron can challenge the "authority for and constitutionality of the Governor's actions." *Commonwealth ex rel. Beshear*, 498 S.W.3d at 363.

3. Plaintiff Danville Christian Academy, Inc. is a Christian school and a religious nonprofit corporation, the principal office of which is located at 2170 Shakertown Road, Danville, Boyle County, Kentucky 40422.

4

4.     Defendant Andrew Beshear is the Governor of Kentucky. Governor Beshear is the "Chief Magistrate" of the Commonwealth, Ky. Const. § 69, charged with "tak[ing] care that the laws be faithfully executed," Ky. Const. § 81.

## JURISDICTION AND VENUE

5.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because the Commonwealth, through Attorney General Cameron, and Danville Christian Academy, Inc., assert claims against Governor Beshear arising under the Constitution of the United States, as well as claims under Kentucky law over which this Court has supplemental jurisdiction. This declaratory judgment action is further authorized by 28 U.S.C. §§ 2201 and 2202.

6.     The Court has personal jurisdiction over Governor Beshear because he resides in Kentucky, holds office in Franklin County, Kentucky, and engaged in the acts giving rise to this complaint in Franklin County, Kentucky.

7.     This Court is the proper venue under 28 U.S.C. § 1391 because a "substantial part of the events . . . giving rise to the claim[s] occurred" in this district.

8.     Under Local Rule 3.2(a)(2)(A), the Central Division of the Eastern District of Kentucky at Frankfort is the proper division for this action because a substantial part of the events giving rise to this action occurred in Franklin County, Kentucky, where Governor Beshear issued the orders at the heart of this suit.

## FACTUAL BACKGROUND

### The COVID-19 outbreak

9.     Since the initial outbreak, coronavirus has spread through the United States, with each state experiencing varying rates of infection and hospitalization.

North Dakota, for example, leads the nation with an overall infection rate of 9,027 cases per 100,000 population since the beginning of the outbreak.[2] Vermont has the lowest rate at 505 per 100,000 population.[3] And Kentucky is roughly in the middle with a rate of 3,240 per 100,000.[4]

10.     States have also experienced varying survival rates resulting from COVID-19. New Jersey's survival rate is the lowest at 99.81%, and Vermont's is the highest at 99.99%.[5] Kentucky's survival rate of 99.96% is just below West Virginia's rate of 99.97%, and just above Tennessee's rate of 99.94%.[6]

11.     States have also pursued varying policies in dealing with COVID-19, with some being more aggressive than others.

12.     On March 6, 2020, Governor Beshear declared a State of Emergency and activated his emergency authority under KRS Chapter 39A.

13.     Over the next several weeks, Governor Beshear issued a series of executive orders implementing a growing set of restrictions and purporting to suspend laws where he saw fit.

14.     Before and after Governor Beshear declared a State of Emergency, many religious organizations took voluntary measures to prevent the spread of coronavirus and practice social distancing.

---

[2]   *See* CDC COVID Data Tracker, available at *https://covid.cdc.gov/covid-data-tracker/#cases_casesper100k* (last accessed November 20, 2020).
[3]   *Id.*
[4]   *Id.*
[5]   *Id.*
[6]   *Id.*

### Governor Beshear's initial infringements on religious liberty

15.     On March 19, 2020, Governor Beshear took his first step to outright ban religious gatherings across the state. Purportedly acting through Secretary Eric Friedlander, of the Cabinet for Health and Family Services, the Beshear administration issued an order stating that "[a]ll mass gatherings are hereby prohibited."

16.     In the March 19th order, the Beshear administration vaguely described the scope of the order as including "any event or convening that brings together groups of individuals, including, but not limited to, community, civic, public, leisure, faith-based, or sporting events; parades; concerts; festivals; conventions; fundraisers; and similar activities."

17.     Thus, the order specifically banned "faith-based" gatherings by name.

18.     The ban was a broad one, not simply aimed at narrowly banning large gatherings. It did not define mass gatherings based on the number of people coming together, nor did it limit the prohibition to the kind of indoor or closed-space gatherings that increase the risk of community transmission of the virus. Rather, Governor Beshear's March 19 Order broadly banned any activity "that brings together groups of individuals," which specifically included "faith-based" gatherings.

19.     However, the March 19 Order did not apply equally without exception. In fact, the order specifically exempted two kinds of activities from the prohibition.

20.     First, the order stated that "a mass gathering does not include normal operations at airports, bus and train stations, medical facilities, libraries, shopping

malls and centers, or other spaces where persons may be in transit." Religious organizations were not included within that exemption.

21.     Second, the order stated that a mass gathering "does not include typical office environments, factories, or retail or grocery stores where large numbers of people are present, but maintain appropriate social distancing." Like the first group of exemptions, religious organizations were not included.

22.     Thus, under the March 19 Order, faith-based activities were expressly singled out for prohibition, while secular organizations and activities received exemptions—even when gatherings at those secular activities include large numbers of people.

23.     Six days after prohibiting the vaguely-defined-but-broadly-applicable "mass gatherings," on March 25, Governor Beshear issued an executive order closing all organizations that are not "life sustaining." *See* Executive Order 2020-257.[7]

24.     "Life sustaining" was defined in the order as any organization "that allow[s] Kentuckians to remain Healthy at Home." *Id.* The order also included nineteen different categories of business that are "life sustaining" and therefore were free to remain open. *Id.*

25.     Among the exceptions for "life sustaining" activity was "Media," which the order defined as, "Newspapers, television, radio, and other media services." *Id.* The order also allowed organizations like law firms to continue operating under the

---

[7]     Executive    Order    2020-257    (March    25,    2020),    available    at https://governor.ky.gov/attachments/20200325_Executive-Order_2020-257_Healthy-at-Home.pdf (last visited Nov. 20, 2020).

category of "Professional services," which includes "legal services, accounting services, insurance services, real estate services (including appraisal and title services)." *Id.*

26.     Governor Beshear's order did not consider religious organizations to be "life sustaining."

27.     The order did not permit religious organizations to continue providing spiritual nourishment in any way that would constitute a "mass gathering" as might be sincerely required by their members according to the tenets of their faith.

**Governor Beshear specifically targets religious activity**

28.     On Good Friday, two days before Easter Sunday, Governor Beshear held his daily press conference. During his presentation, Governor Beshear announced that his administration would be taking down the license plate numbers of any person attending an in-person church service on Easter Sunday.[8] Then, he said, local health officials would be contacting each person and requiring a mandatory 14-day quarantine. Under Kentucky law, violation of such an order is a misdemeanor punishable by criminal prosecution. *See* KRS 39A.990.

29.     So, even though countless Kentuckians were permitted to gather in offices, big box stores, bus stations, and grocery stores in communities with high numbers of infected individuals, residents of counties like Bell—where there were no diagnosed cases of COVID-19 at the time—were not permitted to attend church.

---

[8]     Alex Acquisto, Kentucky COVID-19 cases up by 242. Total is 1,693. State to quarantine churchgoers. Lexington Herald Leader, updated Apr. 10, 2020, available at https://www.kentucky.com/news/coronavirus/article241923521.html (last visited Nov. 20, 2020)

30. On Easter Sunday, Governor Beshear followed through with his threat. Kentucky State Police troopers, acting on Governor Beshear's orders, traveled to the Maryville Baptist Church to record license plate numbers of those attending the church's Easter service. The troopers also provided churchgoers with written notices that their attendance at the service constituted a criminal act. Afterward, the vehicle owners received letters ordering them to self-quarantine for 14 days or else be subject to further sanction.

### The Sixth Circuit rules against Governor Beshear twice.

31. On Saturday, May 2, 2020, the Sixth Circuit enjoined Governor Beshear from prohibiting drive-in church services so long as the churches adhered to the same public health requirements mandated for "life-sustaining" entities. *See Maryville Baptist Church v. Beshear*, 957 F.3d 610, 616 (6th Cir. 2020) (per curiam).

32. In reaching that conclusion, the Sixth Circuit observed that "[t]he Governor's orders have several potential hallmarks of discrimination." *Id.* at 614. For example, the orders prohibited faith-based mass gatherings by name. *Id.* And they contained broad exceptions that inexplicably allowed some groups to gather while prohibiting faith-based groups from doing so. *See id.*

33. The court further noted that:

[R]estrictions inexplicably applied to one group and exempted from another do little to further these goals and do much to burden religious freedom. Assuming all of the same precautions are taken, why is it safe to wait in a car for a liquor store to open but dangerous to wait in a car to hear morning prayers? Why can someone safely walk down a grocery store aisle but not a pew? And why can someone safely interact with a brave deliverywoman but not with a stoic minister? The Commonwealth has no good answers.

10

*Id.* at 615.

34.     The court concluded that there were much less burdensome means of combatting the COVID-19 outbreak than banning religious gatherings, noting that:

> The Governor has offered no good reason so far for refusing to trust the congregants who promise to use care in worship in just the same way it trusts accountants, lawyers, and laundromat workers to do the same. Are they not often the same people, going to work on one day and attending worship on another? If any group fails, as assuredly some groups have failed in the past, the Governor is free to enforce the social-distancing rules against them for that reason.

*Id.* And the court also pointed out that "[i]f the problem is numbers, and risks that grow with greater numbers, then there is a straightforward remedy: limit the number of people who can attend a service at one time." *Id.*

35.     One week later, on Saturday, May 9, 2020, the Sixth Circuit again enjoined Governor Beshear. *See Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020) (per curiam).

36.     Whereas the May 2 decision enjoined the Governor's ability to stop drive-in church services, the May 9 decision went further and also enjoined his ability to prohibit in-person church services.

37.     The court held that the Governor's orders contained so many exceptions permitting non-religious gatherings that they effectively discriminated against religious exercise.

38.     The court further held that the orders could not satisfy strict scrutiny:

> There are plenty of less restrictive ways to address these public-health issues. Why not insist that the congregants adhere to social-distancing and other health requirements and leave it at that—just as the Governor has done for comparable secular activities? Or perhaps cap the number of congregants coming together at one time? If the

Commonwealth trusts its people to innovate around a crisis in their professional lives, surely it can trust the same people to do the same things in the exercise of their faith. The orders permit uninterrupted functioning of "typical office environments," R. 1-4 at 1, which presumably includes business meetings. How are in-person meetings with social distancing any different from in-person church services with social distancing? Permitting one but not the other hardly counts as no-more-than-necessary lawmaking.

Sure, the Church might use Zoom services or the like, as so many places of worship have decided to do over the last two months. But who is to say that every member of the congregation has access to the necessary technology to make that work? Or to say that every member of the congregation must see it as an adequate substitute for what it means when "two or three gather in my Name," Matthew 18:20, or what it means when "not forsaking the assembling of ourselves together," Hebrews 10:25; *see also On Fire Christian Ctr., Inc. v. Fischer*, No. 3:20-CV-264-JRW, --- F. Supp. 3d ---, 2020 WL 1820249, at *7–8 (W.D. Ky. Apr. 11, 2020).

*Id.* at 415.

39.     The court thus enjoined the Governor again, holding that "at this point and in this place, the unexplained breadth of the ban on religious services, together with its haven for numerous secular exceptions, cannot co-exist with a society that places religious freedom in a place of honor in the Bill of Rights: the First Amendment." *Id.* at 416.

40.     One day earlier, this Court granted a temporary restraining order stopping the Governor from restricting religious practices.

41.     In *Tabernacle Baptist Church of Nicholasville, Inc. v. Beshear*, 459 F. Supp. 3d 847 (E.D. Ky. 2020), this Court concluded that "[e]ven viewed through the state-friendly lens of *Jacobson* [*v. Massachusetts*], the prohibition on religious services presently operating in the Commonwealth is 'beyond what was reasonably required for the safety of the public.'" *Id.* at 854–55 (citation omitted).

**Governor Beshear orders the closure of schools, including private religious schools**

42.     On November 18, 2020, Governor Beshear issued Executive Order 2020-969.[9] A copy of that order is attached as **Exhibit 1**.

43.     This order purports to:

    a.  Close all in-person instruction at all public and private elementary, middle, and high schools in the Commonwealth as of November 23, 2020;

    b.  Require all middle and high schools in the Commonwealth to remain closed at least until January 4, 2021;

    c.  Only permit elementary schools to reopen for in-person instruction between December 7, 2020 and January 4, 2021 if the school is not located in a "Red Zone County" as provided by the Kentucky Department of Health, and the school follows all expectations in the Kentucky Department of Education Healthy at School Guidance on Safety Expectations and Best Practices for Kentucky Schools.

44.      The order allows schools to provide small group in-person targeted services as provided in Kentucky Department of Education guidance. On information and belief, such services do not include in-person classroom instruction.

45.     The order also does not shut down colleges, universities, or childcare centers.

_____

[9]     Executive Order 2020-969 (November 18, 2020), available at https://governor.ky.gov/attachments/20201118_Executive-Order_2020-969_State-of-Emergency.pdf (last visited November 20, 2020).

46.    On the same day that he issued Executive Order 2020-969, Governor Beshear also issued Executive Order 2020-968.[10] A copy is attached as **Exhibit 2**.

47.    Executive Order 2020-968 permits secular establishments like libraries, distilleries, fitness centers, and indoor recreation facilities to continue operating at limited capacity.

48.    Executive Order 2020-968 also permits venues, event spaces, and theaters to continue operating with a maximum of 25 people per room.

49.    Executive Order 2020-968 also permits office-based businesses to continue operating as long as no more than 33% of employees are physically present on any given day.

50.    The day after Governor Beshear issued Executive Order 2020-969 purporting to close all in-person instruction at all public and private elementary, middle, and high schools in the Commonwealth as of November 23, the director of the Centers for Disease control announced "[t]he truth is, for kids K-12, one of the safest places they can be, from our perspective, is to remain in school," and that it is "counterproductive . . . from a public health point of view, just in containing the epidemic, if there was an emotional response, to say, 'Let's close the schools.'"[11]

---

[10]    Executive Order 2020-968 (November 18, 2020), available at https://governor.ky.gov/attachments/20201118_Executive-Order_2020-968_State-of-Emergency.pdf (last visited November 20, 2020).
[11]    Ryan Saavedra, *CDC Director: Schools Among 'Safest Places' Kids Can Be, Closing Schools An 'Emotional Response' Not Backed By Data*, The Daily Wire, November 19, 2020, https://www.dailywire.com/news/cdc-director-schools-among-safest-places-kids-can-be-closing-schools-an-emotional-response-not-backed-by-data.

51.    In response to questions from citizens about the applicability of Executive Order 2020-969 to religious schools, the Attorney General's Office reached out to the Governor's Office for clarification.

52.    The Governor's General Counsel responded as follows in an email that is attached as **Exhibit 3**:

The order concerning schools applies to all public and private schools engaged in primary or secondary education (K-12), regardless of whether they are religiously affiliated. The order does not apply to other forms of instruction or places of worship.  Accordingly, a place of worship that provides religious instruction as part of its services – for example, Sunday School or bible study – may do so.

I hope this answers your question.

53.    Thus, houses of worship may continue to operate and may conduct Bible studies any day of the week in enclosed spaces. They may also hold Sunday school on their premises in enclosed locations. But the Governor refuses to allow religious schools to conduct nearly identical activities.

54.    Moreover, shortly after Governor Beshear ordered religious schools to close their doors, Kentucky's top education official warned certified school personnel who violate the Governor's executive order of licensure consequences. Specifically, Kentucky's Commissioner of Education wrote that "[c]ertified school employees are bound by the Professional Code of Ethics and may be subject to disciplinary action by the Education Professional Standards Board (EPSB) for violation of the Professional Code of Ethics." A copy of this email is attached as **Exhibit 4**.

55.    The EPSB is responsible for "issuing, renewing, suspending, and revoking Kentucky certificate certificates for professional school personnel."[12]

### Danville Christian Academy

56.    Danville Christian is a Christian school and a religious nonprofit corporation the principal office of which is located at 2170 Shakertown Road, Danville, Kentucky 40422. It provides pre-K through 12th grade classes at its facilities. Its Headmaster is James S. Ward II.

57.    In 1994, members of Calvary Baptist Church of Danville, Kentucky, formed a committee to study the idea of starting a Christian school in Danville, Kentucky. After two years of prayer and preparation, they created Danville Christian, which opened for operation on August 15, 1996, at Calvary Baptist Church.

58.    As stated in Danville Christian's Articles of Incorporation, attached to this Complaint as **Exhibit 7**, the purpose of Danville Christian is "to provide a creative, loving, academic environment for children to grow socially, emotionally, physically, academically, and spiritually through individual and group learning experiences under the guidance and nurture of carefully chosen Christian teachers, administrators, and under the Lordship of Jesus Christ. It shall be the purpose of the Danville Christian Academy to encourage all students to grow in a personal relationship with Jesus Christ and to emphasize the value of the eternal soul, the worth of the individual, the love of God for man, and the kinship of all peoples as

---

[12]    http://www.epsb.ky.gov/ (last visited Nov. 20, 2020).

taught in the Holy Scriptures, while providing students with the opportunity for achieving academic excellence."

59.     Danville Christian's vision is to mold Christ-like scholars, leaders, and servants who will advance the Kingdom of God.

60.     Danville Christian's mission statement is to provide students with a Christ-centered environment along with academic excellence so they may grow spiritually, academically, and socially.

61.     Danville Christian has adopted a Statement of Faith that expresses the school's core religious beliefs, including its beliefs about God, the Bible, Jesus Christ, and the afterlife, among other things.

62.     Danville Christian has also adopted what it terms Three Core Beliefs: that Christ is at the center of all that we do; that DCA students and staff are lifelong learners; and that DCA students and staff are ambassadors for Christ.

63.     Danville Christian's Board of Directors prays before its meetings. One of the Board's standing committees is the Committee on Spiritual Life.

64.     Danville Christian believes its responsibility is to inspire children to know and love God; that the purpose of a Christian education is to present students the truth about God's relationship to them personally, to life, the world, and everything in it; that students must be shown that the Word of God is the authoritative source upon which to build a life that has both purpose and meaning; that the philosophy of Christian education calls for an educational process that puts the Bible at the center of all learning and asks the student and the teacher to evaluate

17

all they see in the world—through the eyes of God; that Jesus said, "I am the Way, the Truth, and the Life" (John 14:6); that in Christian education, students learn to use the Bible to evaluate all of life—including what they learn in the classroom.

65.    Danville Christian's educational philosophy is Kingdom Education, which focuses on bringing the home, church, and school into a partnership for the purpose of training the next generation. Kingdom Education is defined as the life-long, Bible-based, Christ-centered process of leading a child into a new identity with Christ, developing a child according to his/her specific abilities given to him by Christ, so that a child is empowered to live a life characterized by love, trust, and obedience to Christ.

66.    Danville Christian requires its staff and administrators to affirm its Statement of Faith and have a saving relationship with Jesus Christ.

67.    Danville Christian requires that at least one parent of each of its students have a saving relationship with Jesus Christ.

68.    A key component of Danville Christian's purpose and educational philosophy is its belief that its students should be educated with a Christian worldview in a communal, in-person environment.

69.    Danville Christian would be unable to fulfill its religious purpose and mission—or implement its religious educational philosophy—and its religious beliefs would be substantially burdened, if it were prohibited from offering in-person, in-class instruction to its students.

70.    All Danville Christian elementary, middle school, and high school students receive daily Bible classes each day of the school year. Danville Christian high school students are required to earn four credits of Bible courses in order to graduate. Danville Christian uses Biblically-based curriculum for many of its courses, and all Danville Christian teachers are required to incorporate Biblical worldview and instruction into all classes and subject matters taught.

71.    All Danville Christian students attend one of two socially distanced chapel services every week provided in the gymnasium. Chapel services include religious instruction and preaching, corporate prayer, musical worship, communal recognition, and encouragement of individual students.

72.    Danville Christian holds corporate prayer at the beginning of each school day as a school, followed by corporate prayer in each individual classroom. Individual classrooms hold corporate prayer before lunch. Danville Christian holds corporate prayer before school events, including athletic events.

73.    Danville Christian's student activities include outreach and mercy ministries such as Operation Christmas Child and the Day of Giving, which provide evangelism and material goods to people in need.

74.    Each year Danville Christian high school students are provided local, regional, and foreign mission opportunities.

75.    Danville Christian's students range from three-year-old pre-school through 12th grade. The school day begins at 8:05 a.m. and ends at 3:15 p.m.

76.     Danville Christian has a total of 234 students. Classroom sizes range from 4 students to 20 students, with most classes ranging from 12 to 17 students.

## Danville Christian Academy's COVID-19 Reopening Plan

77.     Prior to the beginning of the 2020-2021 school year, Danville Christian collaborated with local health officials and consultants—including three medical doctors, among others—to plan the reopening and operation of the school and the safe return of its students and staff during the COVID-19 pandemic.

78.     Danville Christian's reopening and operational plan was submitted to and approved by the director of the Boyle County Health Department, who repeatedly has expressed his approval of the plan and has stated that Danville Christian is "doing it right."

79.     Other schools have contacted and visited Danville Christian for help with their reopening and operational plans.

80.     In accordance with its reopening and operational plan, on August 12, 2020, Danville Christian reopened with direct in-class instruction in which Danville Christian's teachers provide in person instruction to its students in its classrooms.

81.     Attached to this Complaint as **Exhibit 5** is the "DCA Reopen FAQ," which was provided to Danville Christian students and families before the start of the school year. Much of Danville Christian's plan is explained in the DCA Reopen FAQ. Procedures mandated by Danville Christian's plan include, among other things:

a.   Except for pre-school students, students and staff must wear masks when entering, exiting, and moving about the building, such as during classroom changes.

b.   Each student receives a temperature check before entering the building. If a fever (100.4 degrees Fahrenheit) is detected, the individual is not allowed to enter the building and must be fever free for 72 hours and visit a doctor for re-admittance to the building.

c.   Immediately upon entering the building, each student and staff member enters one of two kiosks outfitted with a thermal camera and face recognition software to receive a second temperature check. If a mask has been removed an oral computerized command reminds the individual to re-mask. If a fever (100.4 degrees Fahrenheit) is detected an audible alarm is triggered and the individual is removed from the student population and is not allowed to remain at school, and must be fever free for 72 hours and visit a doctor for re-admittance to the building. The same protocol is applied if a fever is detected later in the school day.

d.   Only if sitting and socially distanced may students remove their masks, and then only if parental permission to do so has been provided.

e.   Student work areas in each classroom have been socially distanced. In areas where adequate social distancing is not possible, Danville

Christian installed large wood-framed plexiglass dividers to separate one student from another.

f.   Teachers wear masks or faceshields while instructing students and maintain social distancing.

g.   Before leaving a classroom, Danville Christian requires all students to wipe down their desk or work area with a disinfectant spray reported to be effective against the novel coronavirus.

h.   Students may access their lockers only at designated times during the day, separated by grade level, and provided that masks and social distance are maintained.

i.   Danville Christian moved lunch service to assigned-seat cubicles in the gymnasium to provide better social distancing. These cubicles are divided by wood-framed plexiglass dividers to separate one student from another.

j.   All students are required to follow a set schedule of multiple hand washings throughout the school day.

k.   Eight hand sanitizing stations have been installed in the building and gymnasium.

l.   All water fountains are closed. Bottled water is provided by Danville Christian. Danville Christian has ordered and is awaiting delivery of retro-fitted touchless water stations designed to refill water bottles.

m. In addition to the normal night custodians, Danville Christian hired a day-time custodian for an additional four hours of cleaning per day to clean all bathrooms during the school day and to help clean the lunch area.

n. Personalized virtual classroom options are provided for students or families who would prefer an alternative to in-person instruction. Only five of Danville Christian's students have chosen this option.

82. Danville Christian' Headmaster estimates that it has spent between $20,000.00 and $30,000.00 on pandemic-related safety precautions and protocols for the 2020-2021 school year.

83. In October, Danville Christian became aware that a student had tested positive for the novel coronavirus. In conjunction with the local health department, Danville Christian determined through contact tracing which student should be quarantined. The student who tested positive and any other students exposed to him, were required to quarantine away from the school for fourteen days.

84. In early November, Danville Christian became aware of a teacher and three students who tested positive for the novel coronavirus. In response, and in coordination with the local health department, on November 9, Danville Christian ceased in-person instruction for 10 days while it monitored student health. On November 18, Danville Christian began bringing its students back for in-person instruction a few grades at a time staggered over several days. The final grades are to return November 23.

23

85.     The virtual option that Danville Christian has provided to a few of its students severely burdens Danville Christian's ability to carry out its religious purpose and mission, implement its Kingdom Education philosophy, and fulfill its religious vision for those students due to the necessity for an in-person, communal environment. Succeeding in these things to any extent with these few virtual students hinges on Danville Christian's ability to continue to provide in-person instruction to the rest of its students.

86.     The Governor's recent order for schools to cease in-person instruction beginning November 23 will prevent Danville Christian from carrying out its religious purpose and mission, implementing its Kingdom Education philosophy, and fulfilling its religious vision.

87.     For example, without in-person instruction, Danville Christian will be unable to provide the Christ-centered, creative, loving, academic environment required for its students to grow and develop in accordance with Danville Christian's religious purpose, mission and vision. It will be unable to have the weekly in-person chapel services and corporate prayer that are a key component to implementing its Kingdom Education philosophy. It will be unable to provide the in-person group experiences central to developing Christ-like scholars, leaders, and servants who will advance the Kingdom of God. It will be unable to provide the in-person interaction with Danville Christian's carefully selected Christian instructors and staff needed to inspire its students to know and love God and to empower its students to live a life characterized by love, trust, and obedience to Christ. It will be unable to assemble

together in-person with staff and students as it believes God through the Bible commands it to do.

88.     Danville Christian has a sincerely held religious belief that it is called by God to have in-person religious and academic instruction for its students.  It is imperative to DCA's religious purpose, mission and vision, and its Kingdom Education philosophy, that DCA continue in-person instruction of its students.

<u>COUNT I</u>
**Violation of the Free Exercise Clause of the First Amendment to the United States Constitution**

89.     The allegations in each of the foregoing paragraphs are incorporated as if fully set forth herein.

90.     The First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const., amend. I.

91.     The right to freely exercise one's religion is incorporated against the states through the Fourteenth Amendment. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

92.     Under the First Amendment, state officials cannot target religious activity for disfavored treatment without satisfying "the most rigorous of scrutiny." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993).

93.     Only a law that is both neutral and generally applicable can avoid this heightened review. But facial neutrality is not enough. "Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." *Id.* at 534. And the government "cannot in

a selective manner impose burdens only on conduct motivated by religious belief." *Id.* at 543.

94.     Executive Order 2020-969 is neither neutral nor generally applicable.

95.     The terms of the order are clear: *all* in-person religious schooling must end, regardless of whether the religious school is taking safety precautions, practicing social distancing, implementing appropriate hygiene standards, or otherwise following all of the requirements imposed on the secular activities that are exempt from the order.

96.     And the list of permissible secular activities is long. On the same day that Governor Beshear *closed* religious schools, he issued an order allowing "office-based businesses" to continue operating in person so long as they limit capacity to 33 percent of their employees. His other preexisting regulations for offices require that employees wear masks while interacting with co-workers or in common areas, and he urges businesses to limit in-person contact with customers "to the greatest extent practicable." [*See* **Exhibit 6**, Requirements for Office-Based Businesses, at 1]. He has not imposed time limitations that prohibit employees from working together in the same workspace for more than 4, 6, 8, or even 10 hours at a time. Instead, he asks "office-based businesses" to abide by simple social-distancing rules and a capacity limit.

97.     Governor Beshear also issued an order allowing venues and event spaces to continue operating with up to "25 people per room"—which is more than many classrooms. The order does not impose a time limit on how long people can

26

gather in a venue or event space. So long as this basic capacity limitation is adhered to, and people follow generally applicable social-distancing and hygiene requirements, they are free to gather in public spaces of no more than 25 people per room.

98.     Gyms also are free to continue operating, so long as they limit capacity to 33 percent of their occupancy limits. *See id.* That means Kentuckians are allowed to run on treadmills, lift weights, or do pilates six feet apart, for unlimited durations, but they cannot sit in a classroom with the same amount of space between them.

99.     The list continues: if the Governor's Order is allowed to take effect, on November 23 in Kentucky, one will be free to crowd into retail stores, go bowling with friends, attend horse shows, go to the movies, attend concerts, tour a distillery, or get a manicure or massage or tattoo. Although there are limits and restrictions that govern how these in-person activities must operate, the Governor has not prohibited them. Yet, starting on November 23, no one in Kentucky is permitted to attend in-person school, even when religious education is a deep and sincere facet of one's faith, and even when those operating religious schools are abiding by strict social distancing and hygiene standards.

100.    Governor Beshear's orders are arbitrary and underinclusive toward secular conduct that creates the same potential risk as the prohibited religious activity.

101.    Governor Beshear's orders do not give religious schools the same opportunities to continue operating as secular establishments like event venues and theaters.

102.    Governor Beshear's actions are not narrowly tailored to the interest that he intends to advance.

103.    Governor Beshear's actions burden religious exercise, and they do so in an undue manner.

104.    The restrictions on private religious schools in Executive Order 2020-969 cannot satisfy strict scrutiny.

105.    Governor Beshear's actions violate the First Amendment Free Exercise rights of Kentuckians, including, but not limited to, Danville Christian.

106.    On behalf of Kentuckians and the Commonwealth as a whole, Attorney General Cameron asks the Court to declare unlawful those portions of Executive Order 2020-969 that prevent religious schools from operating on the same terms as secular establishments that pose comparable public health risks but are nevertheless allowed to remain open in the Commonwealth, and to enjoin Governor Beshear from further enforcement of that unconstitutional restriction on religious activity.

107.    Danville Christian asks the Court to declare unlawful those portions of Executive Order 2020-969 that prevent religious schools from operating on the same terms as secular establishments that pose comparable public health risks but are nevertheless allowed to remain open in the Commonwealth, and to enjoin Governor

Beshear from further enforcement of Executive Order 2020-969 against Danville Christian.

108.    Danville Christian and the citizens of the Commonwealth will suffer irreparable injury if Executive Order 2020-969 is enforced against religious entities.

## COUNT II
## Violation of Section 1 and Section 5 of the Kentucky Constitution

109.    The allegations in each of the foregoing paragraphs are incorporated as if fully set forth herein.

110.    Section 1 of the Kentucky Constitution provides that everyone has the "certain inherent inalienable right[ ] . . . of worshipping Almighty God according to the dictates of their consciences."

111.    Section 5 of the Kentucky Constitution provides that "the civil rights, privileges or capacities of no person shall be taken away, or in anywise diminished or enlarged, on account of his belief or disbelief of any religious tenet, dogma or teaching," and that "[n]o human authority shall, in any case whatever, control or interfere with the rights of conscience."

112.    These two provisions protect the right to the free exercise of religion in the same manner as the First Amendment to the United States Constitution. *See Gingerich v. Commonwealth*, 382 S.W.3d 835, 839 (Ky. 2012).

113.    Thus, because Governor Beshear's executive orders target religious activity for disfavored treatment and are not narrowly tailored to meet the state's interest, the orders unconstitutionally infringe on Kentuckians' rights under Sections 1 and 5 of the Kentucky Constitution.

114.    On behalf of Kentuckians and the Commonwealth as a whole, Attorney General Cameron asks the Court to declare that Sections 1 and 5 of the Kentucky Constitution are violated by those portions of Executive Order 2020-969 that prevent religious schools from operating on the same terms as secular establishments that pose comparable public health risks but are nevertheless allowed to remain open in the Commonwealth, and to enjoin Governor Beshear from further enforcement of unconstitutional restriction on religious activity.

115.    Danville Christian asks the Court to declare that Sections 1 and 5 of the Kentucky Constitution are violated by those portions of Executive Order 2020-969 that prevent religious schools from operating on the same terms as secular establishments that pose comparable public health risks but are nevertheless allowed to remain open in the Commonwealth, and to enjoin Governor Beshear from further enforcement of Executive Order 2020-969 against Danville Christian.

116.    Danville Christian and the citizens of the Commonwealth will suffer irreparable injury if Executive Order 2020-969 is enforced against religious entities.

## COUNT III
**Violation of religious entities' First Amendment right to religious autonomy**

117.    The allegations in each of the foregoing paragraphs are incorporated as if fully set forth herein.

118.    Governor Beshear's executive order impermissibly infringes on the autonomy of religious institutions and churches in violation of the First Amendment.

119. The Governor, consistent with the First Amendment, cannot tell religious institutions and churches that they *can* hold in-person worship services but *cannot* hold in-person schooling.

120. Yet, that is exactly what the Governor's executive order does.

121. It accordingly cannot stand under the First Amendment.

122. Governor Beshear's November 18 executive order bans in-person schooling at all private, religious schools starting on Monday, November 23, 2020.

123. At the same time, however, Governor Beshear has specifically permitted in-person worship services to continue.

124. In Executive Order 2020-968, Governor Beshear ordered that his new limits on gatherings "does not apply to in-person services at places of worship, which must continue to implement and follow the Guidelines for Places of Worship."

125. Thus, viewing the Governor's two executive orders together, he has prohibited all in-person religious schooling while simultaneously allowing in-person worship services to continue. This he cannot do.

126. Just this year, the United States Supreme Court held, by a 7–2 vote, that the First Amendment protects the right of religious institutions and churches to make decisions about how to direct religious schooling. *Our Lady of Guadalupe*, 140 S. Ct. at 2055 (2020).

127. If religious institutions get to decide for themselves who teaches their children about religious faith, as *Our Lady of Guadalupe* holds, it follows that

religious institutions get to decide in the first instance whether to provide religious schooling.

128. The government can no more tell religious institutions not to provide religious schooling than it can tell them to employ certain people to accomplish this mission. Each is "essential to the institution's central mission." *See id.* at 2060.

129. Governor Beshear's executive orders tell religious institutions and churches that they cannot open their doors to schoolchildren, and it does so in an especially pernicious way. Not only has Governor Beshear told religious schools that they cannot hold in-person classes, but he is simultaneously permitting religious institutions to hold in-person worship services. That is to say, Governor Beshear has declared that certain religious activities are legal—namely, in-person worship—while others are illegal—specifically, in-person religious schooling. The First Amendment forbids this direct "intru[sion]" onto the "autonomy" of churches and religious institutions.

130. As noted above, the Governor's top lawyer acknowledges that Governor Beshear is dictating what services religious institutions can and cannot provide. According to the Governor's General Counsel, in-person schooling is off-limits, but in-person "religious instruction as part of its services—for example, Sunday School or [B]ible study" is permissible.

131. This divvying up of religious services as legal and illegal by Governor Beshear irretrievably intrudes on religious institutions' "autonomy," and it cannot satisfy strict scrutiny.

132.    On behalf of Kentuckians and the Commonwealth as a whole, Attorney General Cameron asks the Court to declare that Executive Order 2020-969 violates religious entities' First Amendment right to religious autonomy, and to enjoin Governor Beshear from further enforcement of that order against religious entities.

133.    Danville Christian, as a religious entity, asks the Court to declare that Executive Order 2020-969 violates its First Amendment right to religious autonomy, and to enjoin Governor Beshear from further enforcement of that order against Danville Christian.

134.    Danville Christian and the citizens of the Commonwealth will suffer irreparable injury if Executive Order 2020-969 is enforced against religious entities.

## COUNT IV
### Violation of the Establishment Clause of the First Amendment to the United States Constitution

135.    The allegations in each of the foregoing paragraphs are incorporated as if fully set forth herein.

136.    The Establishment Clause demands neutrality by the government toward religious groups. *See Larsen v. Valentine*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.").

137.    The Governor's executive order violates this core principle by favoring religious organizations that provide in-person worship services over those that provide in-person schooling.

138.   Governor Beshear's executive orders permit all manner of in-person worship to continue—Sunday services, Sunday school, Bible studies, and Wednesday night services. A religious organization that wishes to provide these services can continue doing so.

139.   However, if the religious organization desires to open its doors to schoolchildren, it is forbidden.

140.   The Establishment Clause prohibits Governor Beshear from favoring some religious organizations—those that only offer in-person worship services—and disfavoring other religious organizations—those that offer in-person schooling.

141.   Neutrality toward religious organizations is the standard, and the Governor's executive order are anything but neutral.

142.   On behalf of Kentuckians and the Commonwealth as a whole, Attorney General Cameron asks the Court to declare that Executive Order 2020-969 violates the Establishment Clause of the First Amendment, and to enjoin Governor Beshear from further enforcement of that order against religious entities.

143.   Danville Christian asks the Court to declare that Executive Order 2020-969 violates the Establishment Clause, and to enjoin Governor Beshear from further enforcement of that order against Danville Christian.

144.   Danville Christian and the citizens of the Commonwealth will suffer irreparable injury if Executive Order 2020-969 is enforced against religious entities.

## COUNT V
### Violation of the Kentucky Religious Freedom Restoration Act

145.   The allegations in each of the foregoing paragraphs are incorporated as if fully set forth herein.

146.   Kentucky's Religious Freedom Restoration Act ("RFRA") is clear: "Government shall not substantially burden a person's freedom of religion." KRS 446.350.

147.   A "burden" is defined to include even "indirect burdens such as withholding benefits, assessing penalties, or an exclusion from programs or access to facilities." *Id*.

148.   As with the strict scrutiny analysis in the constitutional context above, to survive under RFRA the government must show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties in these cases.

149.   There is no question that the Governor's executive order bars "access" to religious facilities—the Governor has, after all, ordered that no children may attend in-person instruction. Executive Order 2020-969 ("All public and private elementary, middle, and high schools (kindergarten through grade 12) shall cease in-person instruction.").

150.   There is, likewise, no question that the Governor's order has imposed penalties.

151.   In an e-mail dated November 19, 2020, the Commissioner of the Department Education has ominously warned that "[c]ertified school employees . . .

may be subject to disciplinary action by the Education Professional Standards Board (EPSB) for violation of the Professional Code of Ethics" and that "KRS 156.132 provides for the removal or suspension of public school officers, including local board members, for immorality, misconduct in office, incompetence, willful neglect of duty or nonfeasance."

152.   Thus, the Beshear administration has threatened to revoke the certifications for school employees that do "not follow the Governor's order."

153.   These actions infringe upon religious freedom.

154.   The Governor cannot prove "by clear and convincing evidence that [he] has a compelling governmental interest in" such infringement, nor can he prove by clear and convincing evidence that he has used the "least restrictive means to further that interest." KRS 446.350.

155.   On behalf of Kentuckians and the Commonwealth as a whole, Attorney General Cameron asks the Court to declare that the portions of Executive Order 2020-969 that restrict religious activity violate the Kentucky Religious Freedom Restoration Act, and to enjoin Governor Beshear from further enforcement of that order in ways that would violate the Kentucky Religious Freedom Restoration Act.

156.   Danville Christian asks the Court to declare that Executive Order 2020-969 violates its rights under the Kentucky Religious Freedom Restoration Act, and to enjoin Governor Beshear from further enforcement of that order against Danville Christian.

157.    Danville Christian and the citizens of the Commonwealth will suffer irreparable injury if Executive Order 2020-969 is enforced against religious entities.

## **PRAYER FOR RELIEF**

WHEREFORE, Danville Christian requests the following relief on behalf of itself, and Attorney General Daniel Cameron requests the following relief on behalf of the Commonwealth of Kentucky:

A.    A declaration that Executive Order 2020-969, as applied to in-person instruction at Danville Christian Academy and other religious institutions, violates: the Free Exercise and Establishment Clauses of the First Amendment; the right under the First Amendment for religious entities to exercise autonomy over their religious worship and services; the rights guaranteed by Sections 1 and 5 of the Kentucky Constitution; and the rights protected by the Kentucky Religious Freedom Restoration Act;

B.    A temporary restraining order, preliminary injunction, and permanent injunction prohibiting Governor Beshear and any of his officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with him, from enforcing Executive Order 2020-969 against Danville Christian Academy and any other religious entity.

C.    Any other relief in law or equity to which the Commonwealth of Kentucky *ex rel.* Attorney General Cameron and Danville Christian might be entitled.

Respectfully submitted by,

**DANIEL CAMERON**
**Attorney General of Kentucky**

/s/ Carmine G. Iaccarino
Barry L. Dunn
  *Deputy Attorney General*
S. Chad Meredith
  *Solicitor General*
Matthew F. Kuhn
  *Deputy Solicitor General*
Carmine G. Iaccarino
  *Assistant Attorney General*
Brett R. Nolan
  *Special Litigation Counsel*
Office of Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Barry.Dunn@ky.gov
Chad.Meredith@ky.gov
Matt.Kuhn@ky.gov
Carmine.Iaccarino@ky.gov
Brett.Nolan@ky.gov

*Counsel for the Commonwealth*

**Danville Christian Academy**

/s/ Joseph A. Bilby (with permission)
Joseph A. Bilby
BILBY LAW PLLC
222 Eastover Drive
Frankfort, Kentucky 40601
joe@bilbylaw.com

David J. Hacker*
Justin Butterfield*
Roger Byron
Hiram S. Sasser, III*
FIRST LIBERTY INSTITUTE
2001 W. Plano Pkwy., Ste. 1600
Plano, Texas 75075
Tel: (972) 941-4444
Fax: (972) 941-4457
dhacker@firstliberty.org
jbutterfield@firstliberty.org
rbyron@firstliberty.org
hsasser@firstliberty.org

*Counsel for Danville Christian Academy*
(**pro hac vice* application forthcoming)

## DECLARATIONS

On behalf of Danville Christian Academy, Inc., pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing paragraphs no. 56 to 88 are true and correct.

Executed on November 20, 2020       /s/ James S. Ward II (with permission)
                                    James S. Ward II

On behalf of the Commonwealth of Kentucky, pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 20, 2020       /s/ Victor B. Maddox
                                    Victor B. Maddox

38