**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION AT FRANKFORT**
*Electronically Filed*

**DANVILLE CHRISTIAN ACADEMY, INC., et. al.**:   Case No. 3:20-CV-00075-GFVT

    Plaintiffs                                         :

v.                                                          :

**ANDREW BESHEAR**, *in his official capacity as*   :
*Governor*

                                                              :

    Defendant

**MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR TEMPOARY RESTRAINING ORDER, AND PRELIMINARY INJUNCTION, BY INTERVENING PLAINTIFFS PLEASANT VIEW BAPTIST CHURCH, PLEASANT VIEW BAPTIST SCHOOL, DALE MASSENGALE, VERITAS CHRISTIAN ACADEMY, HIGHLANDS LATIN SCHOOL, MARYVILLE BAPTIST CHURCH, MICAH CHRISTIAN SCHOOL, JACK ROBERTS, FAITH BAPTIST CHURCH, FAITH BAPTIST ACADEMY, TOM OTTO, WESLEY DETERS AND MITCH DETERS, ON BEHALF OF THEMSELVES AND THEIR MINOR CHILDREN MD, WD, and SD, CENTRAL BAPTIST CHURCH, CENTRAL BAPTIST ACADEMY, CORNERSTONE CHRISTIAN SCHOOL, AND JOHN MILLER, ON BEHALF OF HIMSELF AND HIS MINOR CHILDREN BM, EM, AND HM**

Intervening Plaintiffs Pleasant View Baptist Church, Pleasant View Baptist School, Pastor Dale Massengale, Veritas Christian Academy, Maryville Baptist Church, MICAH Christian School, Pastor Jack Roberts, Mayfield Creek Baptist Church, Mayfield Creek Christian School, Pastor Terry Norris, Faith Baptist Church, Faith Baptist Academy, Pastor Tom Otto, Wesley Deters, Mitch Deters, on behalf of themselves and their minor children, MD, WD, and SD, Central Baptist Church, Central Baptist Academy, Pastor Mark Eaton, Cornerstone Christian Church, Cornerstone Christian School, and John Miller, on behalf of himself and his minor children BM, EM, and HM, (collectively the "Christian School Plaintiffs"), submit this

1

Memorandum in Support of their Emergency Motion for Temporary Restraining Order and Preliminary Injunction.[1]

**I.    FACTS**

Background and COVID-19 actions by the Governor

In March, 2020 and in the weeks that followed, Governor Beshear issued a number of restrictions related to COVID-19.  (Int. Compl., ¶7).  On March 19, 2020, Governor Beshear implemented an outright ban on religious gatherings across the state.  (Int. Compl., ¶8). Specifically, Governor Beshear, acting through Secretary Eric Friedlander of the Cabinet for Health and Family Services, issued an order stating that "[a]ll mass gatherings are hereby prohibited."  *Id.*   In the March 19, 2020 order, Governor Beshear broadly described the scope of his prohibition as including "any event or convening that brings together groups of individuals, including, but not limited to, community, civic, public, leisure, faith-based, or sporting events; parades; concerts; festivals; conventions; fundraisers; and similar activities."  (Int. Compl., ¶9).

Thus, the order, while very broad, specifically banned "faith-based" gatherings by name. (Int. Compl., ¶10).  The order did not define mass gatherings merely based on the number of people coming together, nor did it narrow its prohibition to the kind of indoor or closed-space gatherings that increase the risk of community transmission of the virus.  *Id.*  Rather, Governor Beshear's March 19, 2020 Order broadly banned any activity "that brings together groups of individuals," which specifically included any and all "faith-based" gatherings.  *Id.*

---

[1] Because well settled, and recent, case law makes this Motion and relief sought exceedingly straightforward, this Motion deals with <u>only</u> the Governor's restrictions on shutting down in person religious school classes.  We will file a separate motion for a restraining order and preliminary injunction relating to his ban on groups (and families) of more than 8 gathering in private residences.

2

However, in an exercise in unconstitutional word play, and due to an unconstitutional value judgment, the order carved out purely secular activities from the scope of its prohibition. Specifically, the order went on to state that "a mass gathering does not include normal operations at airports, bus and train stations, medical facilities, libraries, shopping malls and centers, or other spaces where persons may be in transit." *Id.* The order also stated that a mass gathering "does not include typical office environments, factories, or retail or grocery stores where large numbers of people are present, but maintain appropriate social distancing."

Thus, under the March 19, 2020, mass gatherings with a faith-based purpose were expressly singled out for prohibition, while mass gatherings of secular organizations and their activities were not—even when those secular activities involved large numbers of people. (Int. Compl., ¶13).

On Good Friday, two days before Easter Sunday, Governor Beshear held his daily press conference. (Int. Compl., ¶14). During his presentation, Governor Beshear announced that his administration would be taking down the license plate numbers of any person attending an in-person church service on Easter Sunday. *Id.* Then, he said, local health officials would be contacting each person and requiring a mandatory 14-day quarantine. *Id.* Under Kentucky law, violation of such an order is a misdemeanor punishable by criminal prosecution. See KRS 39A.990. *Id.*

On Easter Sunday, Governor Beshear acted on his unconstitutional threat. Kentucky State Police troopers, acting on Governor Beshear's orders, traveled to the Maryville Baptist Church to record license plate numbers of those attending the church's Easter service. (Int. Compl., ¶15). The troopers also provided churchgoers with written notices that their attendance at the service

3

constituted a criminal act. *Id.* Afterward, the vehicle owners received letters ordering them to self-quarantine for 14 days or else be subject to further sanction. *Id.*

On Saturday, May 2, 2020, and as a result of an emergency appeal, the Sixth Circuit enjoined Governor Beshear from prohibiting drive-in church services so long as the churches adhered to the same public health requirements mandated for "life-sustaining" entities. See *Maryville Baptist Church v. Beshear*, 957 F.3d 610, 616 (6th Cir. 2020) (per curiam). One week later, on Saturday, May 9, 2020, again as a result of an emergency appeal, the Sixth Circuit again enjoined Governor Beshear. *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020) (per curiam), which extended Maryville to re-open in-person worship in the Commonwealth.

One day earlier, this Court granted a temporary restraining order stopping Governor Beshear from restricting religious practices. In *Tabernacle Baptist Church of Nicholasville, Inc. v. Beshear*, 459 F. Supp. 3d 847 (E.D. Ky. 2020), this Court concluded that "[e]ven viewed through the state-friendly lens of Jacobson [v. Massachusetts], the prohibition on religious services presently operating in the Commonwealth is 'beyond what was reasonably required for the safety of the public.'" *Id.* at 854–55 (citation omitted).

In the face of this well-established law, on November 18, 2020, Governor Beshear issued two executive orders, Executive Order 2020-968, and 2020-969, which are attached to the Intervening Complaint as Exhibits A and B. (Int. Compl., ¶26).

Executive Order 2020-969 ("School Ban") prohibits and criminalizes in-person instruction for all schools, including private, religious schools, in grades K-12. Consequently, this School Ban unconstitutionally infringes on the rights of certain of these Plaintiffs, who

4

include religious education and worship services as part of their educational mission, which is based upon their sincerely held beliefs. (Int. Compl., ¶28).

While banning in-person religious education and instruction, the Governor permits a number of comparable secular activities of varying sizes. (Int. Compl., ¶29). The Governor permits childcare programs to continue, including limited duration child care centers, which are permitted to have children in group sizes of 15, and, depending on the space of the facility, hundreds of children. Just as schools do, these facilities provide meals for children, and instruct children in classroom set ups identical to schools. (Int. Compl., ¶30). These centers are permitted to, and do, provide secular education instruction as part of their programming, including assisting children with school assignments. *Id.*

Governor Beshear permits unlimited sizes of persons to assemble in factories and manufacturing, with social distancing, and, indeed, classroom instruction can occur in these settings. (Int. Compl., ¶31). Governor Beshear permits movie theaters to operate, with children in attendance, at 50% capacity. (Int. Compl., ¶32). Executive Order 2020-968 permits gyms and fitness centers to operate at 33% capacity. (Int. Compl., ¶33). Governor Beshear permits auctions to operate at 50% capacity indoors, and unlimited capacity outdoors. (Int. Compl., ¶34). Gas stations, grocery stores, retail establishments, and other businesses also remain open. (Int. Compl., ¶35). Governor Beshear permits gaming facilities to remain open. (Int. Compl., ¶36). Governor Beshear permits secular colleges and universities to remain open. (Int. Compl., ¶37).

Amazingly, the very day after Governor Beshear issued Executive Order 2020-969, which as of November 23 closed, and criminalized attendance at, all in-person instruction at all public and private elementary, middle, and high schools in the Commonwealth, the director of

5

the CDC announced "[t]he truth is, for kids K-12, one of the safest places they can be, from our perspective, is to remain in school," and that it is "counterproductive . . . from a public health point of view, just in containing the epidemic, if there was an emotional response, to say, 'Let's close the schools.'" (Int. Compl., ¶40). Houses of worship may continue to operate and may conduct Bible studies any day of the week in enclosed spaces. (Int. Compl., ¶41). They may also hold Sunday school on their premises in enclosed locations. *Id.* But, Governor Beshear refuses to allow religious schools to conduct nearly identical activities in, at least for some of these Plaintiffs, the same exact space. *Id.*

The Plaintiffs, and their Protected Activities

Plaintiffs Pleasant View Baptist Church, Pleasant View Baptist School, Pastor Dale Massengale operate and run a church and school in McQuady, Breckenridge County, Kentucky, with 70 children attending in grades K-12. (Int. Compl., ¶42). Veritas Christian Academy is located in Lexington, Fayette County, with 170 children attending in grades K-12. (Int. Compl., ¶43). Highlands Latin School is located in Louisville, Jefferson County, with approximately 700 children attending in grades K-12. (Int. Compl., ¶44).

Plaintiffs Maryville Baptist Church, MICAH Christian School, and Pastor Jack Roberts operate and run a church and school in Hillview, Bullitt County, Kentucky, with approximately 175 children attending in grades K-12. (Int. Compl., ¶45). Plaintiffs Mayfield Creek Baptist Church, Mayfield Creek Christian School, and Pastor Terry Norris operate and run a church and school in Bardwell, Carlisle County, Kentucky, with approximately 45 children attending in grades K-12. (Int. Compl., ¶46).

Plaintiffs Faith Baptist Church, Faith Baptist Academy, Pastor Tom Otto operate and run a church and school in Bardwell, Carlisle County, Kentucky, with approximately 31 children attending in grades K-12. (Int. Compl., ¶47). Plaintiffs Central Baptist Church, Central Baptist Academy, Pastor Mark Eaton operate and run a church and school in Mount Vernon, Rockcastle County, Kentucky, with approximately 10 children attending in grades between K-12. (Int. Compl., ¶49). Cornerstone Christian Church and Cornerstone Christian School operates and runs a church and school in London, Laurel County, Kentucky with 115 children enrolled in grades K-12, and John Miller is the President of the Board of the school and a parent who brings the case on his own behalf and those of his minor children who attend the school, BM, EM, and HM. (Int. Compl., ¶50).

Plaintiffs Wesley Deters, Mitch Deters, on behalf of themselves and their minor children, MD, WD, and SD bring suit for the private, parochial school shutdown as well. (Int. Compl., ¶48). The children attend parochial schools within the Covington Diocese of the Catholic Church. *Id.* The Diocese has indicated that it would keep the children in-person for instruction but-for the challenged school shutdown orders and, thus, an order enjoining enforcement of these orders redresses the injury to these Plaintiffs. *Id.* Tens of thousands of students attend these diocesan schools. *Id.*

In each case, the school is an extension of the church and ministry and, as part of the school curriculum, the children have religious education and chapel service. (Int. Compl., ¶¶ 42-50). In each case, attendance at the various schools by the children and instruction provided by the school is part of the sincerely held religious beliefs of the congregants of the church. Id.

Further, and for the avoidance of all doubt, the schools have all implemented, at significant cost, COVID-19 mitigation measures including, without limitation, social distancing,

7

sanitation, temperature checks, partitions, lunch room procedures, mask wearing, and other CDC recommended control measures. *Id.* Further, there is absolutely no evidence of any community spread of COVID-19 within the schools. *Id.*

That is not to say that there have not been children or staff members with cases in these schools, but there have not been any clusters or evidence of spread within the schools. This is in accordance with increasing evidence that schools that practice social distancing and other COVID-19 mitigation measures do not contribute to the spread of the disease, but, in fact, help to mitigate it.[2]

Collectively, the preceding Plaintiffs, the "Christian School Plaintiffs" would be unable to fulfill their religious purpose and mission—or implement their religious educational philosophy—and their religious beliefs would be substantially burdened, if the schools were prohibited from offering in-person, in-class instruction to their students. (Int. Compl., ¶51).

## II. LAW AND ARGUMENT

### A. Standard of Review

When deciding whether to issue a temporary restraining order or preliminary injunction, the court must consider the following four factors: (1) Whether the movant has demonstrated a strong likelihood of success on the merits; (2) Whether the movant would suffer irreparable harm; (3) Whether issuance would cause substantial harm to others; and (4) Whether the public interest would be served by issuance. *Suster v. Marshall*, 149 F.3d 523, 528 (6th Cir. 1998); *Northeast Ohio Coalition for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir.

---

[2] https://www.wabi.tv/2020/11/20/maine-cdc-director-says-covid-19-is-not-being-spread-in-schools/ (last visited 11/22/2020); https://blogs.edweek.org/edweek/campaign-k-12/2020/11/governors-schools-open-covid-thanksgiving.html (last visited 11/22/2020); https://www.foxcarolina.com/cdc-director-says-coronavirus-is-not-spreading-in-schools/article_2405f032-e5f2-54eb-a555-defe9f70a88a.html (last visited 11/22/2020).

2006).   These "are factors to be balanced, not prerequisites that must be met." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

Clear Sixth Circuit law establishes that the remaining factors are met where constitutional rights are infringed upon, and so, in these cases, the likelihood of success factor is dispositive. *H.D.V. - Greektown, LLC v. City of Detroit*, 568 F.3d 609 (6th Cir. 2009) (abuse of discretion not to grant preliminary injunction where constitutional violation found); *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020); *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (irreparable harm from violation of rights); *Foster v. Dilger*, 2010 U.S. Dist. LEXIS 95195 (EDKY 2010) (no substantial harm to others, even where registry incurred printing costs, where constitutional rights at stake); *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982); *see also G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1999) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").[3]

**B. Plaintiffs have demonstrated a likelihood of success on the merits for their Free Exercise Claim**

Executive Order 2020-969 ("School Ban") prohibits and criminalizes in person instruction for all schools, including private religious schools, in grades K-12, such as certain of these Plaintiffs, which include such religious education, and worship services as part of that education, as a part of their sincerely held beliefs.

In the meantime, the Governor has permitted a number of comparable or perhaps even more risky secular activities.  While banning in-person religious education and instruction, the Governor permits a number of comparable secular activities of varying sizes.  (Int. Compl., ¶29).

---

[3] As an aside, the Intervening Plaintiffs have unquestionably demonstrated standing through their interactions with the local health departments that have confirmed enforcement and enforcement threats, as well as the Education Commissioner's public statements.  (Int. Compl. ¶¶ 55-63).

The Governor permits childcare programs to continue, including limited duration child care centers,[4] which are permitted to have children in group sizes of 15, and, depending on the space of the facility, hundreds of children.[5] Just as schools do, these facilities provide meals for children, and instruct children in classroom set ups identical to schools. (Int. Compl., ¶30). These centers are permitted to, and do, provide secular education instruction as part of their programming, including assisting children with school assignments. *Id.*

Governor Beshear permits unlimited sizes of persons to assemble in factories and manufacturing, with social distancing, and, indeed, classroom instruction can occur in these settings.[6] (Int. Compl., ¶31). Governor Beshear permits movie theaters to operate, with children in attendance, at 50% capacity.[7] (Int. Compl., ¶32). Executive Order 2020-968 permits gyms and fitness centers to operate at 33% capacity. (Int. Compl., ¶33). Governor Beshear permits auctions to operate at 50% capacity indoors, and unlimited capacity outdoors.[8] (Int. Compl., ¶34). Gas stations, grocery stores, retail establishments, and other businesses also remain open.

---

[4] A limited duration center was a "pop up" center, often hosted by local YMCA's, were originally set up for the children of "essential" healthcare workers, first responders, and others. They have had favored status for months, and, with the recent school shutdown, that favored status remains even more apparent.

[5] https://apps.legislature.ky.gov/law/kar/922/002/405E.pdf (last visited 11/20/2020).

[6] https://govsite-assets.s3.amazonaws.com/s47CFNaSK6YhJMGPHBgB_Healthy%20at%20Work%20Reqs%20-%20Manufacturing%20Distribution%20Supply%20Chain%20-%20Final%20Version%203.0.pdf (last visited 11/20/2020).

[7] https://govsite-assets.s3.amazonaws.com/0iTtfR0ET2GFa05zMWie_2020-7-1%20-%20Healthy%20at%20Work%20Reqs%20Movie%20Theaters%20-%20Final%20Version%203.0.pdf (last visited 11/20/2020)

[8] https://govsite-assets.s3.amazonaws.com/VTgkgeDSbmgsImOob3lA_2020-7-22%20-%20Healthy%20at%20Work%20Reqs%20-%20Auctions%20-%20Version%203.1.pdf (last visited 11/20/2020)

(Int. Compl., ¶35). Governor Beshear permits gaming facilities to remain open.[9] (Int. Compl., ¶36). Governor Beshear permits secular colleges and universities to remain open. (Int. Compl., ¶37).

As in *Roberts*, 958 F.3d 409, "[d]o the four pages of exceptions in the orders, and the kinds of group activities allowed, remove them from the safe harbor for generally applicable laws? We think so." *Id.* at 413. "As a rule of thumb, the more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law." *Id.* "At some point, an exception-ridden policy takes on the appearance and reality of a system of individualized exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny." *Id.* at 413-414.

As in *Roberts*, "the Church[es] and [their] congregants just want to be treated equally." *Id.* at 414. "They don't seek to insulate themselves from the Commonwealth's general public health guidelines." *Id.* "They simply wish to incorporate them into their worship [and education] services." *Id.* "They are willing to [and do] practice social distancing." *Id.* "They are willing to [and do] follow any hygiene requirements." *Id.* "They do not ask to share a chalice." *Id.* "The Governor has offered no good reason for refusing to trust the congregants who promise to use care in [education as an outreach of their] worship in just the same way it trusts accountants, lawyers, and laundromat workers to do the same." *Id.* Thus, "restrictions inexplicably applied to one group and exempted from another do little to further these goals and do much to burden religious freedom." *Id.* at 414.

---

[9] https://www.kentuckytoday.com/stories/as-many-mitigate-restriction-damages-gaming-venues-keep-rolling,29171 (last visited 11/21/2020).

"All of this requires the orders to satisfy the strictures of strict scrutiny." *Id.* at 415. "They cannot." *Id.* "At the same time, no one contests that the Governor has a compelling interest in preventing the spread of a novel, highly contagious, sometimes fatal virus." *Id.* "The question is whether the orders amount to "the least restrictive means" of serving these laudable goals." *Id.* "That's a difficult hill to climb, and it was never meant to be anything less." *Id.*

"There are plenty of less restrictive ways to address these public-health issues." *Id.* "Why not insist that the [religious school students] adhere to social-distancing and other health requirements and leave it at that—just as the Governor has done for comparable secular activities?" *Id.* "Or perhaps cap the number of [students] coming together at one time [just as the Governor did for daycares]?" *Id.* "If the Commonwealth trusts its people to innovate around a crisis in their professional lives, surely it can trust the same people to do the same things in the exercise of their faith." *Id.*

Perhaps, however, the best evidence of all is experience: these Plaintiffs have held in person classes since August, without clusters of COVID-19 or COVID-19 spread within the schools. Why? Because they have limited class sizes, required masks, sanitized frequently, spread students out in a socially distanced manner, implemented hand-washing requirements, temperature checks, and implemented CDC best practices.[10]

The Governor's ban on in-person school for religious schools is violative of the Free Exercise Clause for yet another reason: it violates the right of religious autonomy. *Our Lady of Guadalupe*, 140 S. Ct. at 2055. The question presented in *Our Lady of Guadalupe* was whether "the First Amendment permits courts to intervene in employment disputes involving teachers at

---

[10] https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/schools.html (last visited 11/22/2020).

12

religious schools who are entrusted with the responsibility of instructing their students in their faith." *Id.* The Court held that "[t]he religious education and formation of students is the very reason for the existence of most private schools, and therefore the selection and supervision of the teachers upon whom the schools rely to do this work lie at the core of their mission." *Id.* (emphasis added). As a result, the Court concluded that a religious institution's decision about who educates its children about religious faith is "an internal church decision that affects the faith and mission of the church." *Id.* at 2062 (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 190 (2012)). It, in other words, is a decision that is "essential to the organization's central mission." *Id.* at 2060. The First Amendment "outlaws . . . intrusion" into such matters. *Id.*

In reaching this conclusion, the Court emphasized the centrality of religious schooling to religious faith. The Court explained that "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Id.* at 2064 (emphasis added). "Religious education … is vital to many faiths practiced in the United States." *Id.* For example, "in the Catholic tradition, religious education is 'intimately bound up with the whole of the Church's life.'" *Id.* at 2065 (*quoting* Catechism of the Catholic Church 8 (2d ed. 2016)). "Similarly, Protestant churches, from the earliest settlements in this country, viewed education as a religious obligation." *Id.* In fact, "[m]ost of the oldest educational institutions in this country were originally established by or affiliated with churches, and in recent years, non-denominational Christian schools have proliferated with the aim of inculcating Biblical values in their students." *Id.* The Court also discussed the centrality of religious schooling to other faiths, including Judaism, Islam, the Church of Jesus Christ of Latter-day Saints, and Seventh-day Adventists. *Id.* at 2065–66. The

13

Supreme Court thus observed the "close connection that religious institutions draw between their central purpose and educating the young in the faith." *Id.* at 2066.

The Government can no more prohibit religious societies from conducting in person classes than it can dictate who can and cannot be employed by them.

Not only has Governor Beshear told religious schools that they cannot hold in-person classes, but he is simultaneously permitting religious institutions to hold in-person worship services. Governor Beshear has thus declared that certain religious activities are legal—namely, in-person worship—while others are illegal—specifically, in-person religious schooling. The First Amendment forbids this direct intrusion onto the "autonomy" of churches and religious institutions.

This case is not distinguishable from *Roberts*.[11] As such, a restraining order and/or preliminary injunction should be granted on the Intervening Plaintiffs' Free Exercise Claims.

### C. Plaintiffs have demonstrated a likelihood of success on the merits for their Establishment Clause Claim

A statute or practice that touches on religion, if it to be permissible under the establishment of religion clause of the Constitution's First Amendment, (1) must have a secular purpose, (2) must neither advance nor inhibit religion in its principal or primary effect, and (3) must not foster an excessive entanglement of government with religion. In *Allegheny v. ACLU of Pittsburgh*, 492 U.S. 573 (1989). These requirements are conjunctive, not disjunctive.

---

[11] The Governor may argue that a one-justice concurrence in *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (Mem.) (2020), which arose in a different procedural context, somehow changes this conclusion. This Court has already rejected that argument. *Ramsek v. Beshear*, No. 3:20-cv-36, 2020 WL 3446249, at *4–*6 (E.D. Ky. June 24, 2020), appeal filed No. 20-5749 (6th Cir.). And the Sixth Circuit recently reiterated that its decisions in *Maryville Baptist* and *Roberts* remain binding. *See Maryville Baptist Church, Inc. v. Beshear*, 977 F.3d 561, 563 (6th Cir. 2020) (per curiam).

The touchstone for analysis is the principle that the "First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968). "Manifesting a purpose to favor one faith over another … clashes with the 'understanding, reached . . . after decades of religious war, that liberty and social stability demand a religious tolerance that respects the religious views of all citizens . . . .'" *McCreary County v. ACLU*, 545 U.S. 844, 860 (2005).

Is there any secular purpose towards permitting religious services and education in the chapel and Sunday School, but not during the week in the classroom? No. That, alone, is fatal to the Governor. Does the closure orders advance nor inhibit religion in its principal or primary effect? Yes. Again, fatal to the Governor. Does the closure orders foster an excessive entanglement of government with religion? Yes. Again, fatal to the Governor.

As such, a restraining order and/or preliminary injunction should be granted on the Intervening Plaintiffs' Establishment Clause Claims.

### D. Plaintiffs have demonstrated a likelihood of success on the merits for their Kentucky RFRA Claim

Governor Beshear's school-closure order also violates Kentucky law. Kentucky's Religious Freedom Restoration Act ("RFRA") is clear: "Government shall not substantially burden a person's freedom of religion." Ky. Rev. Stat. 446.350. A "burden" is defined to include even "indirect burdens such as withholding benefits, assessing penalties, or an exclusion from programs or access to facilities." Id. In cases brought under RFRA, judges "may question only the sincerity of a plaintiff's religious belief, not the correctness or reasonableness of that religious belief." *On Fire Christian*, 453 F. Supp. 3d at 913. "And as with the strict scrutiny analysis in the constitutional context above, to survive under RFRA the government must 'show that it lacks other means of achieving its desired goal without imposing a substantial burden on

15

the exercise of religion by the objecting parties in these cases.'" *Id.* (*citing Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 727 (2014)); *see also Maryville Baptist Church*, 957 F.3d at 612 ("[T]he purpose of the Kentucky RFRA is to provide more protection than the free-exercise guarantee of the First Amendment . . . .").

There is little doubt that Governor Beshear's orders substantially burdens freedom of religion, and excludes the Plaintiffs from programs and access to facilities.

Governor Beshear must prove "by clear and convincing evidence that [he] has a compelling governmental interest in infringing the specific act or refusal to act and has used the least restrictive means to further that interest." Ky. Rev. Stat. 446.350. In other words, can the Governor's order survive strict scrutiny? No. As described above, the Governor cannot meet his evidentiary burden. That is particularly so in light of his decision to permit the myriad of exceptions and continued operations of various activities.

As such, a restraining order and/or preliminary injunction should be granted on the Intervening Plaintiffs' Kentucky RFRA Claims.

### E. Plaintiffs have demonstrated a likelihood of success on the merits for their right to have a private education and control their child's education claim

Approximately 100 years ago, the United States Supreme Court established in *Meyer v. Nebraska*, 262 U.S. 390 (1923), that parents had the right to direct and control the education of their children, including as to curricula.  Two years later, the Court decided *Pierce v. Society of Sisters*, 268 U.S. 510 (1925).  There, as here, the Plaintiff provided "secular and religious education and care of children."  *Id.* at 532.  There, as here, "[s]ystematic religious instruction and moral training according to the tenets of the … Church are also regularly provided." *Id. See, also, Farrington v. Tokushige*, 273 U.S. 284 (1927); *Wisconsin v. Yoder*, 406 U.S. 205

16

(1972); *Troxel v. Granville*, 530 U.S. 57, 66 (2000); *Runyon v. McCrary*, 427 U.S. 160, 178 (1976).

Where, as here, the claim is coupled with a Free Exercise challenge, strict scrutiny is applied to restrictions upon private religious schools. *Ohio Ass'n of Indep. Sch. v. Goff*, 92 F.3d 419, 423 (6th Cir. 1996); *Vandiver v. Hardin County Bd. of Educ.*, 925 F.2d 927, 931 (6th Cir. 1991). Can Governor Beshear meet strict scrutiny? Again, the answer is no. While he may have a compelling interest in preventing the spread of COVID-19, all evidence to date suggests no spread going on in schools that implement public health and safety protocols. Moreover, he could have treated the private religious schools to operate like the daycares and universities, permitting in person classes, while perhaps requiring sanitation, distancing, and other public health protocols (which all of these Plaintiffs have been implementing all along).

### F. Plaintiffs have demonstrated a likelihood of success on the merits for their right to Peaceably Assemble and Associate claim

The First Amendment guaranties the right "of the people peaceably to assemble." This guaranty has also been incorporated against the states. *DeJonge v. Oregon*, 299 U.S. 353 (1937); *NAACP v. Button*, 371 U.S. 415, 430, 83 S. Ct. 328, 9 L. Ed. 2d 405 (1963) (finding that "the First and Fourteenth Amendments protect certain forms of orderly group activity"). These rights, being fundamental rights, trigger strict scrutiny. *Clark v. Jeter*, 486 U.S. 456, 461 (1988).

The right of association, also, is implicated where individuals associate to exercise other First Amendment rights, including the group exercise of religion. *Roberts v. United States Jaycees*, 468 U.S. 609, 617-618 (1984). There is no question but that these Plaintiffs have banded together to exercise, as a group, their sincerely held religious beliefs, which includes religious instruction of their children. *Our Lady of Guadalupe*, 140 S. Ct. at 2055

Again, strict scrutiny is triggered. And, again, the Governor cannot meet his burden under that heightened scrutiny on these facts.

### G. A statewide injunction and restraining order should issue

As this Court articulated recently in *Tabernacle Baptist Church*, 459 F. Supp. 3d 847, 856, and in looking to the principles articulated in *Califano v. Yamasake*, 442 U.S. 682 (1979), "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." "In the present case, the Executive Order at issue does not just affect [the named and Intervening Plaintiffs]." *Id.* The Executive Order applies to all [private religious schools]." *Id.* "Therefore, … injunctive relief may extend statewide because the violation established impacts the entire state of Kentucky." *Id.*

### III.  CONCLUSION

Intervening Plaintiffs have demonstrated that the requested Emergency Temporary Restraining Order and Preliminary Injunction should be granted.

Respectfully submitted,

/s/ Christopher Wiest_____
Christopher Wiest (KBA 90725)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
859/486-6850 (v)
513/257-1895 (c)
859/495-0803 (f)
chris@cwiestlaw.com

/s/Thomas Bruns_____
Thomas Bruns (KBA 84985)
4750 Ashwood Drive, STE 200
Cincinnati, OH 45241
tbruns@bcvalaw.com
513-312-9890

18

/s/Robert A. Winter, Jr.
Robert A. Winter, Jr. (KBA #78230)
P.O. Box 175883
Fort Mitchell, KY 41017-5883
(859) 250-3337
robertawinterjr@gmail.com

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I certify that I have served a copy upon all Counsel of Record by serving same in the Court's CM/ECF System this 22 day of November, 2020.

/s/ Christopher Wiest